## FIRST NAT. BANK OF WOODWARD v. SAVERE.

No. 18137. Opinion Filed June 12, 1928.

Rehearing Denied Sept. 18, 1928.

(Syllabus.)

1. **Appeal and Error—Assignment of Error in Exclusion of Evidence—Record of Excluded Evidence Necessary.**

Where a party excepts to the exclusion of evidence by the court and assigns same as error, there must be a showing in the record as to what the excluded evidence would have been before the court can say there was reversible error in so ruling.

2. **Same—Assignment of Error in Instructions—Necessary that Instructions be Set out in Brief.**

Where plaintiff in error complains of the giving of several instructions designated simply by number, but no effort is made to comply with Rule 26 of this court by setting out said instructions either in whole or in part in his brief, nothing is presented to this court for review.

3. **Judgment—Denial of Judgment Notwithstanding Verdict not Erroneous..**

Where an issue of fact is presented by the pleadings, requiring proof aliunde for determination, and there is no special finding of fact made in the case, it is not error for the court to deny plaintiff's motion for judgment non obstante veredicto.

4. **Judgment Sustained.**

Evidence examined, and same supports the verdict.

Commissioners' Opinion, Division No. 2.

Error from District Court, Woodward County; James B. Cullison, Judge.

Action by First National Bank of Woodward against Forest Savere on promissory note. Judgment for defendant, and plaintiff appeals. Affirmed.

Chas. R. Alexander, for plaintiff in error.

L. A. Foster and C. H. Wyand, for defendant in error.

BENNETT, C. First National Bank of Woodward sued Forest Savere in district court of Woodward county for recovery of balance due on a promissory note executed by defendant, Savere, on December 29, 1923, for $450 payable to Farmers Bank of Mutual. Said note bore ten per cent. interest. The petition, with copy of note attached, was in usual form, alleging execution, maturity, and nonpayment of note; that said note before maturity was indorsed for value by payee to plaintiff who is now owner and holder thereof. Plaintiff demands judgment for balance due thereon, together with interest and attorney's fees.

The answer of defendant is, first, a general denial, second, an admission that defendant executed the note sued on to Farmers Bank of Mutual; and admits assignment to plaintiff of the note sued on as alleged in plaintiff's petition; third, that W. R. Clapham had been acting cashier of Farmers Bank of Mutual, and that L. L. Stine had been president and general manager of First National Bank for a number of years; that said Stine was one of the principal stockholders of Farmers Bank of Mutual, and that said Stine had general control, management and supervision over both First National Bank of Woodward and Farmers Bank of Mutual, including the making of loans, discounts, collections and re-

newals of said loans, etc., and that after assignment to plaintiff of note sued on, to wit, April 5, 1924, Farmers Bank of Mutual was agent of plaintiff for purpose of receiving and accepting payments on said note, and for the purpose of settling and satisfying same, and that on the last-named date defendant paid said note in full to cashier of Farmers Bank of Mutual and its cashier, W. R. Clapham, as agent of and for benefit of plaintiff. There was a reply by way of, first, a general denial, and, second, a denial that Farmers Bank of Mutual or W. R. Clapham were agents of plaintiff, or had authority to collect or receive settlement of or payment upon the note sued on for plaintiff.

The following is the substance of the evidence: O. L. Bane identifies the note sued on and same is introduced in evidence without objection. Plaintiff rests, and thereupon defendant produces his evidence. Forest Savere, defendant, in substance, testified as follows: Has been doing business with the Farmers Bank of Mutual for some years, and knows cashier, Mr. W. R. Clapham; recalls executing note sued on, a copy of which is attached to plaintiff's petition and marked "Exhibit A"; the note bears date December 29, 1923, due March 7, 1924; this is a renewal note of a former note which witness made to the bank; has executed a number of notes at different times to Farmers Bank of Mutual, and paid them and renewed them; always dealt with cashier, Waldo Clapham. About time this note became due had some conversation with Mr. Clapham, cashier, about paying note. At that time witness had $50 in money, and owed another small note in bank, and suggested that he wished to pay $50 on $450 note and renew same, but cashier suggested that he pay the cash on another note and make application to Federal Intermediate Bank for sufficient money to take up the $450 note. The cashier explained it to witness who then made application for the money from Credit Bank. The application was for $500, $450 of which was to take up note in suit, and $50 was to pay for one share in a company to be organized to deal with Credit Bank. Soon thereafter an inspector came and looked at collateral and approved the security, and witness and wife signed a note to Federal Intermediate Credit Bank, and secured same by a chattel mortgage on 50 head of cattle, and perhaps other property. These papers were made out for witness by W. R. Clapham, cashier; and in a few days the cashier told him the money had come and was at bank at Mutual, and witness went over to Farmers Bank at Mu-

tual to see about it, and told cashier that he was there to straighten up business and take up old note, that is, the note on which this suit is brought, and cashier said, "I am so busy that I can't do that just this evening. You come in in a few days and we will straighten this up." Witness went in again in a few days and told cashier that he did not want to pay interest on both notes, and that he would like to get matter straightened out and get possession of his old note, and he, cashier, said:

"I am just so busy that I haven't got around to it yet, but I will see you get it the first of the week, or I will send it out to you. Your money is here to take this up with, and it is due to my neglect that I haven't got to it. I have been so busy I haven't got to it, but I will send this old note to you the first of the week."

The cashier said "Your note is paid; the money is here to pay it with, and you can just figure that that is settled." Witness made a chattel mortgage to secure the note sued on at time it was executed in favor of Farmers Bank of Mutual, but when this money was borrowed from Federal Credit Bank, it was necessary to have this chattel mortgage released, and it was released by cashier, Mr. Clapham, and a new chattel mortgage was made to secure the $500 note, which witness was making to get money to take up note in suit. Witness did not know that the note had been turned over to plaintiff at all; did not know that said note had been discounted, assigned or transferred. Witness always paid and settled his notes with Mr. Clapham, the cashier, and while he gave a number of notes to Farmers Bank of Mutual, they were always paid to Mr. Clapham and settlement was made with him; had no knowledge that any of witness' notes were ever turned over or assigned to possession of another. Did not always get possession of old notes at time of payment. Sometimes they were turned over to witness several days after they were paid.

In securing the money from Intermediate Credit Bank at Wichita, Kan., it became necessary for those who were applying for money to organize a company and take out a local charter, and that was done in this instance. Several farmers were organized under direction and advice of Mr. Clapham. When the money came it was not put to credit of witness in bank; it was secured to take up this note sued on and was not put in witness' account or to his credit in any way. The sum of $282.50 was credited on note, but witness had nothing to do with it. Mr. Bane wrote witness that it had been

applied, and that was the first witness heard of it or knew about it. The credit was there, but witness was in nowise responsible for putting it there. When the money came, cashier said he was too busy to get up note, but that the note was paid. Witness received no notice from First National Bank of Woodward that they held note until after Mr. Clapham left and after Farmers Bank of Mutual failed. Mr. Bane, from First National Bank of Woodward, came down to talk to witness about this note and said, "We can't touch the security; we can just hold you for your old note." He said he could not touch the security because Mr. Clapham had released it so the property could be used as security for the other note, the $500 note, and that was the arrangement between Mr. Clapham and witness. That was all done through him. The new $500 note to Federal Intermediate Credit Bank was made at Farmers Bank at Mutual, and it was left there.

W. R. Clapham, witness for defendant, testified that he was at one time connected with Farmers Bank at Mutual as cashier, say, for eight or nine years; before that was assistant cashier; acquainted with defendant. He did business at the bank. Exhibits 1 to 13 represent original notes for money loaned Savere by the bank. Such are copies of original notes that Bank of Mutual rediscounted to First National Bank of Woodward. There are three copies of notes so discounted among exhibits 1 to 13. These copies of original notes after discounting same were kept so that witness would have something to check notes by. These were rediscounted through First National Bank of Woodward. Farmers Bank of Mutual did all of its discounting through First National Bank of Woodward, and the discounting was handled in following fashion: The notes discounted would be indorsed with or without recourse by Farmers Bank of Mutual and signed W. R. Clapham, cashier. Witness would send a bunch of notes for rediscounting to First National of Woodward which bank would enter up credit for same in favor of Farmers Bank of Mutual. Sometimes they would discount $25,000 worth of such notes. The $450 note in suit was discounted in same way. Witness discounted other notes of Mr. Savere about that time. Before this note was due Federal Intermediate Credit Bank of Wichita was loaning to a bunch of farmers in a way to help relieve the situation, and witness was up at Woodward talking with Mr. Stine about it, and he (Mr. Stine) made arrangements for witness and a bunch of farmers to go to Wichita to try to get money to take up

their notes. The arrangement for the meeting was made by Mr. Stine. We found when we got to Wichita, Kan., that a local company had to be organized. Mr. Stine wanted witness to go down to Vici and talk with certain officers of Citizens State Bank to have them go in in order to perfect the organization.

Witness went to Oklahoma City, secured a charter and had collaterals appraised. Some were accepted and some were rejected. Mr. Stine first initiated steps to have this money secured. He made all arrangements for trip, time of leaving, etc. The purpose was to get money to take up our rediscounts and relieve the situation with the banks at that time. Mr. Stine owned nearly half the capital stock of Farmers Bank of Mutual. First National was the only correspondent we had outside of Commerce Trust Company—we did a little business through Security National of Oklahoma City. This method of discounting notes with First National of Woodward had been going on four or five years.

"Q. Now, when you discounted paper to the First National Bank of Woodward, what, if anything, did you or the Farmers Bank of Mutual have to do with that paper afterwards—I mean with regard to collecting it or renewing it and looking after it? A. We went ahead and looked after it just the same as though it was in our own bank. Q. Suppose a note was discounted, a note was given to the Farmers Bank of Mutual, and you discounted that note to the First National Bank, supposing the maker came in and wanted to pay the note, what was done? A. I accepted the money and called the First National Bank of Woodward, or wrote them a letter and told them to charge it against our account and send it (the note) on to us. Q. How long did you follow that practice? A. That was the only practice we ever had. Q. That was the custom between the two banks for several years prior to the time the Farmers Bank of Mutual closed? A. Ever since I was connected with the bank. Q. Mr. Clapham, suppose a maker of a note whose note had been discounted to the First National Bank, was to come in and want to renew it. What was the practice in a case like that? A. I made out the renewal and had the mortgage recorded, and then I would send his new note up and replace it with the old one. Q. Did the First National Bank always accept payment made through you in that way? A. Yes, sir; it did. Q. And they always accepted renewal notes that were taken by you in that way, did they? A. Yes, sir; they did. Q. Now, suppose a note was down there, and you had a note rediscounted, and the maker would come in and want to make a payment on it and paid interest, what would you do in such a case? A. It would be handled the same as the other. * * * Q. They always

accepted it, did they? A. They did; yes, sir. Q. Well, did those incidents occur quite frequently? A. They did. Q. During the years that you were connected with the Farmers Bank of Mutual? A. Yes, sir; they were done quite frequently."

Witness knows about loan from Federal Intermediate Credit Bank. He made out papers; went through all preliminaries, organized company, wrote applications, and went out with inspector when loans were considered, and when they were approved drew up papers; had mortgages executed and recorded and took papers to Wichita, Kan., and received the money. The local company was called Farmers Security Company; had three officers, of which witness was secretary and treasurer. The understanding with Mr. Savere when his application was taken was that $450 of the $500 was to take up note sued on, and $50 was for a share of stock in Farmers Security Company. That was our agreement. Witness received the money from Federal Intermediate Credit Bank. It amounted to $477.83. When this money came it could not be disbursed until chattel mortgage securing the $450 in suit was released and witness released that mortgage. When money came it was not put to credit of Savere. It was placed to the credit of Farmers Security Company in Farmers Bank at Mutual. It was in form of remittance; it was cleared through the First National Bank of Woodward.

"Q. For what purpose was that check received by the Farmers Bank of Mutual? A. It was received for the purpose of taking up the loan of Forest Savere of $450. Q. This note that is being sued on here? A. Yes, sir. Q. Was that money ever credited to the individual account there of Forest Savere? A. No."

The first time Savere came in he did not have sufficient money to pay interest on $500 loan, and witness was too busy to take matter up. Savere came in again and had money, but witness put him off as he was busy, but the money was received by Farmers Bank of Mutual for the purpose of paying this note, and was accepted by witness as cashier for that purpose. The amount received, plus cash which he paid in, was sufficient to take up note. After money came witness told Savere that the money had come to take up note. Witness had received proceeds of loan before releasing the chattel mortgage securing note in suit.

"Q. Mr. Clapham, did you in your dealings with the First National Bank of Woodward ever receive instructions or directions from Mr. Stine as to how to handle and what to do regarding this paper that was discounted? A. Yes, sir."

Often he had written letters and given witness instructions over telephone about papers, telling witness to go ahead and get papers fixed up, get the notes made up and take up the old ones. The note in suit was among those about which he was talking, and witness was instructed to get the notes fixed up, or renewals made, or have them charged in against the account of Farmers Bank.

"Q. You had a custom by which you could pay off one of these notes with the First National Bank of Woodward at any time you wanted to pay it, did you not? A. Yes, sir. Q. In fact, many a time you have paid off those notes that you have rediscounted with the First National Bank of Woodward, during the course of the business that you were operating down there in that bank? A. Yes. * * * Q. You would make a remittance from your bank to the First National Bank, covering the note? A. There wasn't any remittance sent. I told them to charge it in against our account. Q. You either had a remittance, or else you had an account there that you could have them charged to? A. Yes, sir."

Witness says that it was his intention to have the Savere note canceled and sent back to him; that he never paid off the Savere note. The $500 note was made direct to Farmers Security Company, who rediscounted it to Federal Intermediate Credit Bank; that was way matter was handled. The note and mortgage were assigned by Farmers Security Company to Credit Bank.

"Q. You didn't have any authority to sign a release of that chattel mortgage from the First National Bank of Woodward, did you, Mr. Clapham? A. There never had been any authority, but that was the practice I had maintained ever since I had been rediscounting notes there. * * * Q. When you had notes rediscounted here with the First National Bank of Woodward, and the maker of a note came in and paid the note or paid part of the note, then the matter of getting the money up to the First National Bank of Woodward was just purely a matter of bookkeeping between you and the First National Bank, was it not? A. Yes, that was it."

Witness says that he had not actually taken up Savere note, but that he had money there to take it up—it had been paid Farmers Bank for that purpose.

A. W. Anderson, witness for defendant: Has lived at Woodward 32 years; was vice president of Farmers Bank of Mutual. He knows how loans and discounts between the two banks were handled, and testifies, in substance, that they were handled in same way as indicated by witness Clapham. The

substance of his testimony may be stated as follows: The cashier would simply send papers up to First National of Woodward, which bank would give credit for paper, and when it became due it was either renewed or paid through Farmers Bank at Mutual, and that First National depended upon Farmers Bank to make collections and renewals, and this was always done through Mr. Clapham.

Here defendant rests, and plaintiff interposed a demurrer to the evidence, which was overruled. Thereupon the plaintiff introduced the folowing evidence:

Mr. Bane testified further: Was in First National Bank of Woodward during transaction testified about. Carried accounts with Farmers Bank of Mutual. Soon after closing of Farmers Bank of Mutual, on or about May 1, 1924, witness wrote a letter to the Federal Intermediate Credit Bank of Wichita, Kansas, and undertook to straighten out affairs of Farmers Security Company, and there appeared to be a balance of 60 per cent. due stockholders in Farmers Security Company. The credit on $450 note represents balance that was due to Savere on account, and the amount that was lost to bank of Woodward is the 40 per cent. This was due to failure of Farmers Bank of Mutual, Okla., and that is amount in litigation here.

Mr. L. L. Stine testified for plaintiff, but his evidence is not material.

Miss Jessie Oberlander, for plaintiff, testified also as to recording of chattel mortgage and release of same by Mr. Clapham.

After instructions the jury returned verdict for defendant and plaintiff appealed.

Plaintiff's first contention is that the court erred in sustaining objection to the following question asked by plaintiff in error of Mr. Stine:

"I will ask you if you had at any time given Mr. Clapham of the Farmers Bank of Mutual any authority to collect money for your bank up here down at Mutual, Okla.?"

The refusal of this question by the court was not reversible error. The question is subject to more than one defect, but it is sufficient to say that plaintiff made no offer to show what the answer to the question would have been had the witness been allowed to answer. Plaintiff also asked similar questions of Mr. Bane. These were likewise excluded, but plaintiff in like manner omitted to have the record show what the excluded evidence would have been. For these reasons these alleged errors may be passed.

McKee v. Dickerson, 122 Okla. 240, 254 Pac. 57; Gregory v. State, 126 Okla. 117, 258 Pac. 902.

Plaintiff claims error of the court in not rendering judgment for plaintiff notwithstanding the verdict and, in the twelfth assignment of error, in overruling motion for an instructed verdict. Considering these contentions together, we have gone over the evidence with care in this case, and while it will serve no useful purpose to set out the testimony fully here, it is sufficient to say that plaintiff was neither entitled to an instructed verdict nor a judgment notwithstanding the verdict.

Plaintiff next calls our attention to alleged errors in instructions. In substance, he says that instructions numbered 1, 2, 4, 5, 6, and 7 are erroneous. But the plaintiff nowhere in his brief sets out either the words or the substance of the alleged unfair instructions. This is sufficient ground for treating the alleged errors as waived. Supreme Court Rule No. 26 requires that "where a party complains of instructions given or refused, he shall set out in totidem verbis in his brief separately the portion to which he objects, or may save exceptions," and our court has construed this requirement.

"This court will not consider the instructions complained of unless said rule is complied with. * * *" Carignano v. Box, 97 Okla. 184, at p. 187, 223 Pac. 673; Thompson v. Davis, 124 Okla. 79, 254 Pac. 501; Roof v. Franks, 26 Okla. 392, 110 Pac. 1098; Rhome Milling Co. v. Farmers, etc., Bank, 40 Okla. 131, 136 Pac. 1095.

Upon looking very carefully over the briefs filed and over the entire record, it occurs to us that there is but a single question in this lawsuit, and that is as to whether or not Farmers Bank of Mutual was agent of First National Bank of Woodward for the collection of the amount due on Savere's note. There is almost overwhelming evidence in the record indicating that the Farmers Bank had such authority growing out of its dealings with and its course of conduct towards First National Bank of Woodward, extending over a period of several years. This conduct and these dealings appear for obvious reasons to have been very close and confidential, and, in point of value, running into many thousands of dollars. It seems to have been taken for granted almost that it was for the mutual advantage of these two banks to have the Farmers Bank discount its paper almost, if not quite, exclusively. with the Woodward bank, and have the Farmers Bank make the collections and extensions and settlements with the makers

of these securities, much in the same fashion as if it still owned the paper.

Apparently, the only serious effort made to rebut the effect of this course of conduct and dealing was to ask Mr. Stine if he ever gave authority to the Farmers Bank to collect these notes, and when the court ruled against the admissibility of this evidence, the record was not preserved by having the answers of the witness made a part thereof. We are of the opinion that the verdict of the jury would have been the same in this case if Mr. Stine had been allowed to answer and had answered that he had given the Farmers Bank no authority and that he knew of no authority of that bank to make the collection. Apparently, there was no effort to show that the Farmers Bank had not been collecting, renewing and crediting this kind of paper for the First National Bank. There was no effort, seemingly, to show any repudiation of such acts by the First National Bank, and certainly those facts, if they existed, could have been shown, and since they have not been shown, we must conclude that the plaintiff has not been injured. Upon appeal that party who relies upon error for a new trial must not only point out the error, but show that he has been prejudiced thereby.

Although we are not required to do so for the reasons indicated supra, we have, as a matter of interest, examined the instructions sufficiently to know their contents in order that no injustice may be done. We are of the opinion that no such error has been made in the trial of this cause as has resulted in prejudice to the plaintiff in error. For the reasons given, the judgment of the trial court is affirmed.

DIFFENDAFFER, HERR, JEFFREY, and HALL, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 4 C. J. p. 74, §1662; 2 R. C. L. p. 164; 1 R. C. L. Supp. p. 421; 5. R. C. L. Supp. p. 76; 6 R. C. L. Supp. p. 70; 7 R. C. L. Supp. p. 35. (2) 3 C. J. p. 1419, §1589. (3) 33 C. J. p. 1181, §112.